UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| Paul Holmes, | |
| *Plaintiff,* | Civil No. 3:09cv2088 (JBA) |
| *v.* | |
| The Town of East Lyme, Paul Formica, and Richard Crooks, | |
| | March 30, 2012 |
| *Defendants.* | |

RULING ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Paul Holmes filed suit against Defendants the town of East Lyme, First Selectman Paul Formica, and Resident State Trooper Sergeant Richard Crooks. Plaintiff claims violations of the state whistleblower law, Conn. Gen. Stat. § 31–51m (Count One), unlawful retaliatory termination in violation under Conn. Gen. Stat. § 31–51q (Count Two), violations of due process property and liberty interests under 42 U.S.C. § 1983 (Counts Three and Four), common law defamation and false light invasion of privacy against the Town, Defendant Formica and Defendant Sergeant Richard Crooks (Counts Five and Six), and, against Defendant Sergeant Richard Crooks only, intentional infliction of emotional distress (Count Seven).

Plaintiff moves for partial summary judgment against the Town of East Lyme and Paul Formica [Doc. # 60] on Counts Three and Four (Plaintiff's due process claims), and also moves separately for summary judgment on Counts Five and Six (Defamation and False Light Invasion of Privacy claims) against Sergeant Crooks [Doc. # 64]. Defendants Town of

East Lyme and Paul Formica cross–move for summary judgment [Doc. # 66] on all counts against them, as does Defendant Richard Crooks [Doc. # 63].

For the reasons discussed below, Plaintiff's motion for summary judgment against the Town and Formica will be granted in part and denied in part, and his motion for summary judgment against Crooks will be denied in its entirety. All Defendants' motions for summary judgment will be granted in part and denied in part.

I.      Factual Background

Paul Holmes began working as a part–time police officer for the Town of East Lyme in 1985. In East Lyme, a part–time police officer is known as a "special constable." Since 1987, Plaintiff has been employed by the Connecticut Department of Transportation, and he continues to work there. For a number of years, Plaintiff was reappointed as a part–time police officer every six months  (Holmes Dep., Ex. A to Town's Loc.'s R. 56(a)1 Stmt [Doc. # 66–4] at 34), and this was considered "a long–standing practice" in the Town that has continued even after part–time officers were added to the collective bargaining unit in 1990 (Award of Arbitrator in the Matter of the Arbitration between AFSCME Council 15 Local 2852 and The Town of East Lyme, August 28, 2009, Ex. 3 to Pl.'s Loc. R. 56(a)1 Stmt. at 2; Arb. 6/17/08 F. Kent. Sistare's Testimony, Ex. 25, at 64:25–65:3).

Defendant Formica is the First Selectman of the Town of East Lyme, and was designated to act as Chief of Police. Defendant Richard Crooks is employed by the Connecticut State Police, and held the position of Resident State Trooper for the Town of East Lyme from January 2007 to April 2008. The Resident State Trooper is the highest certified police officer in the Police Department, and provides services to the Town through a contract with the Connecticut Department of Public Safety.

In 2005, the Town of East Lyme and East Lyme Police Local 2852 Council 15, AFSCME entered into a collective bargaining agreement that was in effect from July 1, 2005 to June 30, 2009. Since 1987, Plaintiff was a member of the Union. Sergeant Paul Renshaw is employed as an East Lyme Police Officer, and also serves as President of the Union.

Town police officers fill out weekly time cards that record the number of hours that they worked, along with notes about each set of hours. At his deposition, Plaintiff testified that he learned how to fill out his time card by talking to other officers in the police department. (Holmes Dep. at 24:2–4.) Plaintiff also testified that the number of hours worked, and the rates at which a part–time officer was paid, depended on the type of work that the officer was doing: "that's what we always did. . . . if [you're not already scheduled to work and] you go to court, you get a four–hour block of time at time–and–a–half." (*Id.* at 26:11–13.)

In December 2006, then–East Lyme Administrative Sergeant Terry Saffioti noted errors in Plaintiff's time card, and wrote a memo to Plaintiff asking for clarification and for the hours that Plaintiff actually worked. (Dec. 4, 2006 Memorandum from Sgt. Saffioti to Holmes, Ex. 24 to Crooks' Loc. R. 56(a)1 Stmt.) In June 2007, due to budgetary concerns, Sergeant Crooks issued a directive consistent with Section 5.5.2 of the union contract that no overtime was to be issued without his approval. (Crooks Aff. ¶ 9.) The directive was copied to the First Selectman at that time, Beth Hogan. (*Id.*) Administrative Sergeant Saffioti was tasked with reviewing the time cards, and if there were discrepancies between the work schedule and submissions for overtime, Sergeant Saffioti would make a note on the time card. (Crooks Aff. ¶ 11; Pl.'s Dep. at 53:15–54:7.) Sergeant Saffioti noted several issues with

Plaintiff's time cards in 2007, and Sergeant Saffioti and Plaintiff had a "verbal altercation about Holmes working a shift for which he was not initially scheduled." (Crooks Aff. ¶ 13.)

Prior to December 2007, Plaintiff made several complaints regarding the conduct of East Lyme Police Sergeant Paul Saffioti and Defendant Crooks. On October 1, 2007, Plaintiff wrote a memo to Defendant Crooks, stating, "Sergeant Saffioti is blatantly disregarding the advice of other Sergeants to correct the way he charges time and willfully continues to make the same mistakes." (October 1, 2007 Memorandum from Paul Holmes to Sgt. Crooks, Ex. 4 to Pl.'s 56(a)1 Stmt.) Plaintiff also stated: "Recently, Sergeant Saffioti berated me in the presence of another East Lyme officer making inappropriate comments and threatening to file insubordination charges against me . . . I feel Sergeant Saffioti continues to harass me and this needs to stop immediately." (*Id.*) On November 29, 2007, Plaintiff wrote a memo to Beth Hogan, the First Selectman, alluding to a meeting he had recently had with her, and stating that "since the meeting, tensions between Sergeant Saffioti and myself have escalated. I am always on guard for my safety when around Sergeant Saffioti." (November 29, 2007 Memorandum from Paul Holmes to Beth Hogan, Ex. 5 to Pl.'s 56(a)1 Stmt.) In his memo to Hogan, Plaintiff also wrote, "Sergeant Crooks and yourself have acknowledged there is a problem between Sergeant Saffioti, others, and myself. . . . Please advise me of what actions or investigations you have undertaken to resolve the hostile work environment Sergeant Saffioti has created at the East Lyme Police Department and that Sergeant Crooks has condoned." (*Id.*) Plaintiff was not the only officer to complain of Sergeant Saffioti's behavior, as Lieutenant Fusaro, the Captain of the Connecticut State Police and Commanding Officer, received correspondence from another officer, Joseph Dunn, also complaining about the

hostile work environment created by Sergeant Saffioti. (Fusaro Aff., Ex. 4 to Crooks' 56(a)1 Stmt. ¶ 6.)

On November 29, 2007, First Selectman Beth Hogan wrote a letter to Sergeant Saffioti thanking him for his service, and assigning Sergeant San Juan to be the new Administrative Sergeant, effective December 3, 2007. On December 3, 2007, Defendant Paul Formica began serving as the Town's First Selectman in place of Ms. Hogan. Plaintiff did not follow up with Mr. Formica about his November 29, 2007 memo to Ms. Hogan.

In October and November 2007, a criminal investigation that Plaintiff was involved in required his testimony in court as a witness on November 1 and November 16, 2007. Plaintiff mistakenly listed November 6, 2007 instead of November 1, 2007 as the date he appeared in court on his time card. In December 2007, Defendant Crooks alleged that Plaintiff had not appeared in court on November 6 or November 16, 2007 but that Plaintiff had submitted time cards requesting payment for appearing in court on those dates. Sergeant Crooks did not notice the discrepancy at first, writing, "On 11/11/07, OFC Paul Holmes submitted his weekly time card requesting payment for four (04) hours of overtime for an 11/06/07 court appointment. . . . I did not question this overtime request and authorized payment." (December 20, 2007 Memorandum from Richard Crooks to Lt. Louis Fusaro, Commanding Officer, Ex. 36 to Pl.'s 56(a)1 Stmt. at 1.)  However, Crooks did notice that there was an issue with the November 16 court date, writing, "On 11/18/07, OFC Paul Homes submitted his weekly time card requesting payment for four (04) hours of overtime for an 11/16/07 court appearance. . . . I was aware that Holmes, Sergeant San Juan, and Detective Marr had been subpoenaed for Stanford's trial on 11/16/07, but that the case had been adjudicated." (*Id.*) Crooks stated further,

> I asked OFC Holmes about this overtime and . . . [he] stated that he was never informed that he was not required to appear in court. OFC Holmes stated that he left work on Friday, 1//16/07, that he drove to GA–10 [the courthouse] in New London, and that upon his arrival, was informed that his appearance in court was no longer required. OFC Holmes stated that he requested four hours of overtime because he left work and actually went to court.

(*Id.*) Plaintiff denies that Sergeant Crooks ever followed up with him, and states that "Crooks did not question me about my having appeared at court on any date in November, 2007." (Pl.'s Aff. ¶ 10.)

Sergeant Crooks began an investigation into Plaintiff's time cards. The Town hired Attorney Michael E. Satti to investigate the allegations with regard to time card submissions against Plaintiff. (DVD, Ex. 34 to Pl.'s 56(a)1 Stmt, at 16:57–1:14:30.) Given that this investigation was being conducted, Mr. Formica recommended that Plaintiff's reappointment by the Board of Selectmen be deferred, rather than having the Board consider Plaintiff's reappointment on December 19, 2007. (Formica Dep. at 39.) Defendant Formica announced his decision to defer Plaintiff's reappointment at the December 19, 2007 Board of Selectmen meeting. (6/17/08 Arb. Formica Testimony, Ex. 23 to Pl.'s Loc. R. 56(a)1 Stmt. at 90.) Plaintiff was not present at that meeting and learned that his reappointment was to be deferred from Sergeant Renshaw.

Plaintiff's appointment as a part–time police officer expired on December 31, 2007. Though Defendant Formica offered to meet with Plaintiff on December 29, 30, and 31 to discuss the deferral of his reappointment as a part–time officer, Plaintiff did not respond, and on December 31, 2007, Formica sent a letter to Plaintiff, writing, "Please be advised that in the absence of your meeting with me to discuss this matter, I will make recommendations

to the Board of Selectmen regarding reappointment without the benefit of your input." (Dec. 31, 2007 Ltr from Formica to Holmes, Ex. H to Town's 56(a)1 Stmt.)

On January 9, 2008, Defendant Formica sent Plaintiff a memo regarding a meeting he had scheduled that same day to discuss Plaintiff's reappointment. (Jan. 9, 2008 Memorandum from Formica to Holmes, Ex. I to Def.'s Loc. R. 56(a)1 Stmt.) The memo reads:

> I am meeting with you today to discuss with you some, but not all, of my concerns regarding your recent actions while purportedly acting as a paid employee of the Town. . . . You recently submitted time cards requesting pay for court appearances. . . . These alleged appearances, according to your time card, were on November 6 and November 16, 2007. There has been no substantiation that you ever appeared on either of these dates, and your action in requesting pay for time not worked is a serious matter, which I, on behalf of this Town, take seriously.

(*Id.*) At his deposition, Mr. Formica testified that he did not consider the meeting with Plaintiff to be "potentially disciplinary." Neither Plaintiff nor Sergeant Renshaw were informed prior to January 9, 2008 what the issues or allegations surrounding Plaintiff's deferred reappointment were. At the meeting, Mr. Formica and Selectwoman Rose Ann Hardy met with Plaintiff and Sergeant Renshaw, where Mr. Formica informed Plaintiff that Plaintiff was not entitled to Union representation but the Town would allow Sergeant Renshaw to be present in the capacity of a private citizen. (Consent of Paul T. Holmes, Ex. 14 to Pl.'s 56(a)1 Stmt.) Defendant Formica refused to continue the meeting if Plaintiff did not agree, in writing, to forgo Union Representation. (Renshaw Testimony at 9:11–16.) Though Plaintiff gave his consent, he inserted "I am not in agreement with this document" at the bottom of the page, signing and dating it. (Consent of Paul T. Holmes.) The issues of the November court dates and time card discrepancies were the only issues discussed at this

meeting.  (Renshaw Testimony 13:20–24.) Renshaw testified that "[w]e left [the meeting] feeling that if we could resolve these two dates, these two issues; that the issue of [Plaintiff's] reappointment would be rectified." (*Id.* 13:15–17.)

By January 25, 2008, the fact that Plaintiff had sought four–hour overtime payments in connection with court appearances had become part of the investigation. (Crooks Dep. at 199:17–21.) That same day, Plaintiff provided documentation to the Town and to Mr. Formica showing that he had been in court and testified on the days for which he was accused of not being present. (Jan. 25, 2008 Memorandum from Holmes to Formica, Ex. 8 to Pl.'s 56(a)1 Stmt.) On January 31, 2008, Mr. Formica hand–delivered a memo to Plaintiff, informing him that

> on Wednesday, February 6, 2008, there will be a Board of Selectmen meeting at 7:30 at the East Lyme Town Hall, at which there will be a discussion concerning your conduct as a part time constable for the Town of East Lyme, as well as to consider whether or not you will be reappointed to that part time position. As this is a "personnel matter", it is exempt from public disclosure . . . . [though] you have the right to waive your right to keep this information confidential, including the right to request the executive session be open to the public.
>
> Among topics to be discussed at next Wednesday's meeting are (1) your time card submittals and documentation of time worked regarding 11/6/07, 11/16/07 (for which you recently submitted a written explanation), 12/17/07, 12/18/07, 12/19/07, 12/20/07, 12/22/07, 2007, and 1/09/08; (2) your conduct and demeanor in addressing Sergeant Richard Crooks on December 14, 2007 and December 28, 2007; (3) your failure to complete MRT training recertification in a timely fashion; and (4) your disregard for my direct order that you not be present at the East Lyme Police Department.

(Jan. 31, 2008 Memorandum from Formica to Holmes, Ex. 9 to Pl.'s Loc. R. 56(a)1 Stmt.)

Sergeant San Juan, Plaintiff's Administrative Sergeant, testified that he had spoken with Sergeant Crooks about whether Plaintiff was entitled to four hour minimums at overtime rates, and that Crooks "inquired about whether Holmes was entitled to the four hours pay. I said it was my understanding that he was. As Crooks stood there, I went to the contract [Collective Bargaining Agreement] and showed him what I believed to be the proper area, which is . . . the off–duty court appearance, 5.17. And he agreed." (10/09/08 Arb. San Juan Testimony, Ex. 22 to Pl.'s Loc. R. 56(a)1 Stmt. at 166:3–8.) Sergeant Crooks did not inform Mr. Formica of his conversation with Sergeant San Juan regarding this past practice of four hour minimum time cards. Defendant Formica testified that he was aware that the Plaintiff believed he was entitled to four hour minimum time cards prior to the February 6, 2008 Board of Selectmen meeting. (8/19/08 Arb. Formica Testimony, Ex. 16 to Pl.'s 56(a)1 Stmt. at 89:16–24.)

The evening before the February 6, 2008 Board meeting, Plaintiff requested that the discussion pertaining to his employment be postponed, as he had previously scheduled plans to be out of state. (Feb. 5, 2008 Ltr from Holmes to Formica, Ex. 11 to Pl.'s 56(a)1 Stmt; DVD.) Plaintiff asked that the Town hold its discussion on his personnel matters in open session and that he have Union representation at the meeting and representation through counsel. (*Id.*) Both Plaintiff's request for representation and for postponement were denied and Plaintiff was unable to attend the meeting.

Other than Mr. Formica, who had already decided that Plaintiff should not be reappointed prior to the February 6 meeting (8/19/08 Arb. Formica Testimony at 49:17–18), the remaining members of the Board of Selectmen knew nothing about the investigation until meeting, when they received the binder of exhibits and had a chance to review it at the

9

meeting. Robert Wilson, one of the Selectmen, testified that he "was made aware" of the issue prior to the meeting by Mr. Formica, who had told him "that he had reservations about reappointing Mr. Holmes." (10/09/08 Arb. Wilson Testimony, Ex. 20 to Pl.'s 56(a)1 Stmt. at 29:2–12.)

The Charter of the Town of East Lyme provides that "The First Selectman shall . . . establish and be responsible for the administrative and personnel policies for town offices and employees, with the approval of the Board of Selectmen, and shall execute or cause to be executed the town ordinances, regulations, resolutions and policies voted by the Board of Selectmen." The Board of Selectman provides for the appointment of Constables and Special Constables, and an appointed officer may be removed only for cause by the Board of Selectmen:

> No such removal for cause shall be effected unless the officer or member has received a statement in writing of the reasons why he should be removed. This statement shall be prepared by the Board of Selectmen. Not less than fifteen days after the delivery of the statement of reasons, an opportunity for a public hearing before the Board of Selectmen must be provided at which time the appointed officer or member may appear with counsel.

(Charter at 4.6.1, 4.7.1-4.7.2.)

During the open session meeting, the Board of Selectmen heard from Attorney Satti, who had conducted an investigation into Plaintiff's time card issue. He reported that Plaintiff's time cards to the Town "indicated according to Officer Crooks' report that he was seeking again a multitude of a number of hours for that day there was no court. (DVD at 58:20–32.) Satti further stated that Plaintiff "submitted overtime hours on certain occasions where there's no evidence that there was a court proceeding or there's no evidence that he was actually performing those services." Satti accused Plaintiff of insubordination, stating,

10

"It shows me that there is an attitude that is insubordinate to say the least and that there are serious serious questions about the time that the Town has already paid that it didn't even know that it paid and not in error." (*Id.* at 1:12:36–1:12:52.) Sergeant Crooks also spoke before the Board, stating that he was unfamiliar with the time card policies for part–time officers, "this is really the only instance in my tenure in Town and I've been here fourteen months." (*Id.* at 1:18:26–1:18:38.) Crooks also stated that Plaintiff showed up two hours late for an assignment to McCook Park (the "McCook Park incident") and that "other officers told me that . . . [he] still billed the Town for four hours." (*Id.* at 1:27:12–1:27:29.)[1]

Defendant Formica also spoke at the meeting, stating that Plaintiff "violated the trust" of the Town and that "we do an injustice to the rest of the people who diligently work in that department everyday if we let this sit another day by not making it clear that we are not reappointing this gentleman based on the pattern and history of the activity that you have in front of you with all these pages of documents," and called for an immediate vote confirming the non–reappointment of Plaintiff. Selectman Wilson stated that they had not been made aware that they would need to vote that night. (*Id.* at 1:33:35–45:33.) The Board of Selectmen voted 4–2, with Selectwoman Hardy and Selectman Wilson voting against, to confirm Plaintiff's non–reappointment. (Formica's Testimony at 45; DVD at 1:45:38–1:45:45)

---

[1] Sergeant Crooks later claimed that he had not made that statement (*see* Crooks Dep. at 224–26), and Sergeant Renshaw testified that, to the contrary of what was said during the Board of Selectmen meeting, Plaintiff reported for duty on that night in question despite not being scheduled to work, as a substitute for an on–duty police officer who had been bitten by a dog and required medical attention (Renshaw Testimony at 41:17–46:10.)

On February 22, 2008, an article about Plaintiff's termination was printed in the New London Day newspaper with the headlines "Officer accused of overbilling East Lyme" and "Part–time East Lyme Officer allegedly doctored time cards." New London Day article, Feb. 22. 2008, Ex. 12 to Pl.'s 56(a)1 Stmt.) A recording of the February 6, 2008 Board of Selectmen meeting was broadcast more than once over the public access channel in East Lyme. (Pl.'s Aff. ¶ 13.) The Town's practice is to broadcast these meetings three times each day until a recording from the next Board of Selectmen meeting is aired. (Jan. 31, 2011 Morris Deposition, Ex. 39 to Pl.'s 56(a)1 Stmt. at 9–10.)

After Plaintiff's termination, Plaintiff's daughter was taunted at school and her classmates told her that "your dad steals," and called her father a "crook" and a "thief." (Pl.'s Aff. ¶ 19.) Plaintiff has sought medical and psychiatric treatment after the meeting, and Plaintiff was diagnosed with Post Traumatic Stress Disorder after his termination. (Pl.'s Dep. at 188:23–193:25.)

On February 20, 2008, the Union filed a grievance on Plaintiff's behalf contesting his termination. (Award at 19.) The parties appeared before Arbitrator J. Larry Foy, Esq. for ten arbitration hearings. On August 28, 2009, Arbitrator Foy found that Plaintiff was covered by the Collective Bargaining Agreement, and determined that Plaintiff could not be terminated from his employment except for just cause. (*Id.* at 38–39.) Foy also found that Plaintiff was entitled to a post–deprivation hearing, finding that the proceedings leading to Plaintiff's termination were "wholly lacking in due process." (*Id.* at 46.) Plaintiff was granted reinstatement and back pay in the arbitration award. (Pl.'s Dep. at 207.)

II.     Discussion[2]

      A.     Counts Three and Four: Due Process Claims against the Town of East
Lyme and Paul Formica

Defendants Town of East Lyme and Formica argue that summary judgment is appropriate on both the property and liberty due process claims, claiming that Plaintiff's remedies lie in the grievance and arbitration process, and through litigation of his state tort causes of action. Plaintiff argues that he has a constitutionally–protected property interest in his employment as a Special Constable, and that he was denied the process that he was due when Defendants failed to provide him with notice of all charges against him, an explanation of the evidence against him, and an opportunity to present his side of the story. Plaintiff also contends that the statements made against him by Mr. Formica were injurious to his reputation, and entitle him to summary judgment on his due process "stigma–plus" claim.

      *1.     Count Three: Due Process Deprivation of a Property Interest*

A procedural due process analysis addresses two questions: (1) whether there existed a property interest that was interfered with by the state; and (2) whether the procedures

---

[2] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

provided prior to the denial of the property interest were constitutionally sufficient. *Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004).

Determination of whether Plaintiff possessed a property interest in continued employment is made by reference to rights that are created by state law. *See Board of Regents v. Roth*, 408 U.S. 564, 577 (1972) (property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law–rules"). A public employee who has a right not to be fired without "just cause" has a property interest in his employment. *Otero v. Bridgeport Housing Authority*, 297 F.3d 142, 151 (2d Cir. 2002); *see also Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d. Cir. 1991) ("The collective bargaining agreement between the Town and the police union to which Moffitt belonged guaranteed that he could not be fired without just cause. Accordingly, Moffitt had a property interest in his employment that qualified for the protections of procedural due process.")

The parties do not dispute that police officers in East Lyme, both full– and part–time, are subject to a "for cause" standard for removal. The Collective Bargaining Agreement at Section 8.1 states, "No permanent officer shall be discharged, demoted, suspended or disciplined except for 'just cause.'" The Town Charter provides that Special Constables, i.e., part–time police officers like the Plaintiff, are also subject to a "for cause" standard of removal: "An appointed officer or a member of an appointive board may be removed only for cause by the Board of Selectmen." (Charter, Ex. 37 to Pl.'s 56(a)1 Stmt. at 4.7.1.) Thus, Plaintiff had a protected property interest in his part–time employment with the Town of East Lyme.

Defendants nonetheless maintain that the Plaintiff received all of the process that he was due under the Fourteenth Amendment. Whether the Plaintiff received the process to which he was entitled to safeguard his property interest in his job invokes the interest–balancing test from *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976):

> (1) the nature of the private interest that will be affected by the governmental action; (2) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail; and (3) the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.

*Segal v. City of New York, Dept. Of Ed.*, 459 F.3d 207, 215 (2d Cir. 2006). Plaintiff argues that as a union member entitled to "just cause" to support disciplinary action, he was owed a *Loudermill* hearing, which includes, (1) oral or written notice of the charges against him, (2) an explanation of the employer's evidence, and (3) an opportunity to present his side of the story, before termination of employment. *Cleveland Bd. Of Ed. v. Loudermill*, 470 U.S. 532, 543 (1985). The purpose of a *Loudermill* hearing is as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545–46.

Defendants argue that the private interest at stake is not as important as it has been in other governmental employment cases, because Plaintiff is a part–time police officer. (Town's Mem. Supp. at 10.) While it is undisputed that Plaintiff's primary source of income is his full–time job with the state Department of Transportation, he has held his part–time Special Constable position for over 20 years. Defendants argue that the loss of a secondary

part–time position did not deprive him of his livelihood (*id.*),[3] and thus is a weak "private interest" under *Mathews*, when contrasted with the Town's interest in the free exercise of its responsibilities under the Town Charter to appoint, reappoint or decline to appoint part–time officers. (*Id.* at 11.)

As to the third *Mathews* factor, Defendants argue that the risk of an erroneous deprivation is mitigated by the "prompt post–deprivation procedures of the grievance and arbitration provisions of the Collective Bargaining Agreement" (*id.*),[4] which provided adequate post–deprivation process. The Second Circuit has held that "there is no due process violation where pre–deprivation notice is provided and the deprivation at issue can be fully remedied through the grievance procedures provided for in a collective bargaining agreement." *Adams v. Suozzi*, 517 F.3d 124, 128 (2d Cir. 2008); *see Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 213 (2d Cir. 2003); *Narumanchi v. Bd. of Trustees of Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988) (finding due process was satisfied "by the

---

[3]Defendants do not cite any caselaw in support of the proposition that loss of a part–time job is not a deprivation of a protected interest. There is, however, authority suggesting that part–time government employees are entitled to pre–deprivation process. *See, e.g.*, *Orloff v. Cleland*, 708 F.2d 372 (9th Cir. 1983) (issues of fact existed as to whether part–time physician employee of a Veterans' Administration hospital had a property interest in his employment and whether the VA had accorded the physician with sufficient procedural due process upon his termination).

[4] The Town cites to a recent Second Circuit decision, *Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011), for the proposition that post–deprivation procedures are sufficient. There, the Second Circuit determined that the City of New York was not required to provide a pre–deprivation hearing before it suspended the licenses of taxi drivers who had been arrested. 644 F.3d at 159. However, the Second Circuit did not go so far as to describe what type of process was adequate, writing, "In this case, . . . we cannot yet make these determinations [of adequate process] because the evidence in the record is insufficient to establish that the post–suspension hearing the City describes to us is in fact the hearing that it offers." *Id.* at 160.

pre–deprivation notice and hearing rights provided in the grievance procedures under the [collective bargaining agreement]"). Plaintiff, on the other hand, argues that the existence of a grievance and arbitration proceeding in a collective bargaining agreement does not eliminate or reduce the need to provide adequate pre–deprivation notice. *See, e.g., Ciambrello v. County of Nassau*, 292 F.3d 307, 321 (2d Cir. 2002) (a state worker was entitled to notice and opportunity to be heard before being demoted, regardless of the existence of a grievance procedure to contest the adverse action) (citing *Chaney v. Suburban Bus Division of the Regional Transportation Authority*, 52 F.3d 623, 629 (7th Cir. 1995) ("due process requires pre–termination notice and an opportunity to respond even where a CBA provides for post–termination procedures that fully compensate terminated employees.")). *But see Wojcik v. Mass. State Lottery Comm'n*, 300 F. 3d 92, 102 (1st Cir. 2002) (pre–deprivation notice and "the full arbitration afforded by the collective–bargaining agreement w[ere] more than sufficient to satisfy" due process requirements).

While pre–termination process "need not be elaborate or approach . . . a full adversary hearing, . . . due process does require that before being terminated such an employee be given oral or written notice of the charges against her, an explanation of the employer's evidence, and an opportunity to present her side of the story." *Otero v. Bridgeport Housing Auth.*, 297 F.3d 142, 151 (2d Cir. 2002) (union employee accused of stealing from her employer who was told only that there was "substantial evidence" against her was denied due process). In *Otero*, the Second Circuit held that "merely presenting 'some semblance' of the evidence . . . does not necessarily afford the accused an adequate opportunity to present her side of the story," and that "mere notice of the charge, . . . is not an explanation of the evidence and does not necessarily suffice to provide due process." *Id.* at 151–52. *See also*

17

*Clayton v. City of Middletown*, 564 F. Supp. 2d 105, 116 (D. Conn. 2008) ("In dismissal–for–cause cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect, because permitting the employee to give his version of the events will provide a meaningful hedge against erroneous action.") (citing *Loudermill*, 470 U.S. at 543 n.8).

Even if the grievance and arbitration proceedings provided Plaintiff a remedy for his improper termination, the undisputed characteristics of the pre–termination process do not suffice to meet the requirements of *Loudermill*. It is undisputed that Defendants did not provide Plaintiff with (1) notice of all of the charges against him, (2) an explanation of all the employer's evidence against him, or (3) an opportunity to present his side of the story, either on his own behalf, or through counsel or union representation. Defendants knew that Plaintiff was unable to make the February 6 Board of Selectmen meeting (*see* February 5 Ltr. From Holmes to Formica, Ex. 11 to Pl.'s 56(a)1 Stmt.; DVD, Ex. 34); Defendant Formica did not reschedule the meeting,  allow a Union representative present on Plaintiff's behalf at the meeting to speak for him, or permit Plaintiff to be represented by an attorney. (*See* DVD; February 4, 2008 Email from Eileen Duggan to Ken DeLorenzo, Ex. 15 to Pl.'s 56(a)1 Stmt.[5]) Given the structure of the meeting, and the absence of notice of all charges, Plaintiff had no opportunity to present his side of the story about the practice of submitting four–hour minimums beyond the documentation of time cards surrounding the November 6  and

---

[5] Attorney Duggan wrote, "Mr. Holmes does not have the right to union representation in matters concerning his reappointment." (*Id.*) She also wrote "Paul Holmes may submit written documentation and/or a statement to be considered by the Board . . . Neither Mr. Holmes nor the Union has the right to be present in executive session. If desired, Mr. Holmes may require that the discussion be held in open session, as noted in the prior memo to him delivered on January 31, 2008."(*Id.*)

November 16, 2007 court dates, or regarding the McCook Park Incident. (*See* January 31, 2008 Memorandum from Formica to Holmes, Ex. 9 to Pl.'s Loc. R. 56(a)1 Stmt.)

Mr. Formica's attempts to meet with Plaintiff in late December notwithstanding (*see* Jan. 9, 2008 Memorandum from Formica to Holmes), Plaintiff was never made aware of all of the evidence against him, and Plaintiff thus provided documentation responsive only to the evidence that Formica did notify him about (*See* Jan. 25, 2008 Memorandum from Holmes to Formica). The most serious charge against Plaintiff, that is, his practice of submitting time cards listing a four–hour minimum at overtime rates, did not even arise until the presentation by Attorneys Satti and Duggan at the February 6, 2008 Board of Selectmen meeting. (*See* DVD.) Even Selectpersons Hardy and Wilson observed this procedural deficiency, stating that they "had only heard one side." (*Id.*) *See McDaniel v. Princeton City School District Bd. of Ed.*, 72 F.Supp. 2d 874, 881 (S.D. Ohio 1999), *aff'd* 45 F. App'x 354 (6th Cir. 2002) (summary judgment entered for plaintiff where defendant did not provide notice or opportunity to respond to three of the five reasons noted for her termination in the letter following her *Loudermill* hearing).

Viewing the evidence of record in the light most favorable to the Defendants, no reasonable factfinder could find that the Defendants afforded Plaintiff the process that he was due as a public employee prior to his termination. The Town Charter provides that appointed officers are removable only for cause, and "no such removal for cause shall be effected unless the officer . . . has received a statement in writing of the reasons why he should be removed." (Charter § 4.7.1., Ex. 37 to Pl.'s 56(a)1 Stmt.) Plaintiff was not provided with a complete list of the charges against him prior to the January 9 meeting, and the Town's January 31 notice failed to list the important issue of four hour minimum payments

for off–duty days and scheduled the hearing for Plaintiff less than a week later, contrary to the Charter provisions:

> The statement [in writing of the reasons why he should be removed] shall be prepared by the Board of Selectmen. Not less than fifteen days after the delivery of the statement of reasons, an opportunity for a public hearing before the Board of Selectmen must be provided at which time the appointed officer or member may appear with counsel.

(Charter § 4.7.1–4.7.2.) Accordingly, Defendants' motion is denied, and Plaintiff's motion is granted.

### 2.   Count Four: Due Process Deprivation of a Liberty Interest

Plaintiff and Defendants Town of East Lyme both move for summary judgment on Plaintiff's due process deprivation of liberty claim.

In an action based on a termination from government employment, a plaintiff must satisfy three elements in order to demonstrate a deprivation of the stigma component of a stigma–plus claim."[6] *Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir. 2006):

> First, the plaintiff must . . . show that the government made stigmatizing statements about [her]—statements that call into question [the] plaintiff's good name, reputation, honor, or integrity. We have also said that statements that denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession will satisfy the stigma requirement. Second, a plaintiff must prove these stigmatizing statements were made public. Third, the plaintiff must show that the stigmatizing statements were made

---

[6] At oral argument, Defendants maintained that the action taken at the Board of Selectmen meeting was *not* a termination, and that rather, it was merely a vote concerning the non–reappointment of Mr. Holmes. However, the Court finds this distinction to be merely semantic, as the vote taken at the February 6, 2008 meeting had the effect, and the intention, of terminating Plaintiff's employment as a Special Constable with the Town of East Lyme.

> concurrently with, or in close temporal relationship to, the plaintiff's dismissal from government employment.

*Id.,* 459 F.3d at 212–13 (internal citations omitted). While the Second Circuit has noted that a typical "stigma–plus" case occurs when the state actor makes the stigmatizing statement at the time of termination, "perfect parity in the origin of the stigma and the plus is not required." *Velez v. Levy*, 401 F.3d 75, 89 (2d Cir. 2005).

Defendants argue that the stigmatizing statements made must be defamatory, and that therefore the Plaintiff must prove that the statements complained of were false. *See Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir. 2002). However, "a plaintiff generally is required only to raise the falsity of these stigmatizing statements as an issue, not *prove* they are false." *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004) (emphasis added). *Abramson* describes "situations where the reasons for termination or resignation were given a public airing which impaired the prospects of the employee for other employment" as a possible circumstance giving rise to a claim of denial of a liberty interest. *Abramson*, 278 F.3d at 101.

Defendants also maintain that a defamatory statement must convey an objective fact, "since expressions of mere opinion are generally not actionable." (Town's Mem. at 14.) As illustration, Defendants cite to *Wiese v. Kelley*, No. 08–CV–6348, 2009 U.S. Dist. LEXIS 82307, *19–20 (S.D.N.Y. Sept. 10, 2009), in which the Southern District of New York found the New York Attorney General's description of the conduct "resulting in the loss of data as 'extremely troubling' to be a statement of opinion, rather than fact, and as such is not actionable as a stigmatizing remark." *Id.* (citing *Blackburn v. City of Marshall*, 42 F.3d 925, 936 (5th Cir. 1995) (statement of opinion does not suffice to support

stigma–plus claim because it does not contain "false factual representations, concrete or otherwise"); *see also Strasburger v. Bd. of Educ.*, 143 F.3d 351, 356 (7th Cir. 1998) ("True but stigmatizing statements that preclude further government employment do not support this type of claim. Nor do statements of opinion, even stigmatizing ones, if they do not imply false facts. We also require the statements to come from the mouth of a public official.").

It is undisputed that at the Board of Selectmen meeting, Defendant Formica stated that "I think that he violated the trust," that "everything that I looked at was reviewed and showed a pattern of inconsistencies with this," and that:

> [W]e do an injustice to the rest of the [police officers ] who diligently work in that department every day if we let this sit another day by not making it clear that we are not reappointing this gentleman based on the pattern and the history that you have in front of you with all these pages of documents, a lot of which are signed in his hands.

(DVD.) In making these statements, Defendant Formica relied on Attorney Satti's presentation, which referred to the report from Sergeant Crooks to his commanding officer, stating that the investigatory report on Holmes "raised questions about the legitimacy about the request for payments that have been made." (*Id.* at Ch. 5.)

Unlike the statement of opinion that a plaintiff's behavior was "extremely troubling" in *Wiese*, the statements made at the Board of Selectmen meeting are not just statements of opinion, but are accusations of theft of services which a reasonable juror could find sufficient for proof of a stigma–plus violation. The record does not require a conclusion that they are "true but stigmatizing," *Strasburger v. Bd. of Educ.*, 143 F.3d at 356,  nor mere assertions of Defendant Formica's opinion. Rather, these were statements made by a public official that implied false facts about a scheme Plaintiff had for getting

paid improperly. *Strasburger*, 143 F.3d at 356.[7] Since these statements directly addressed Plaintiff's reputation for honesty and morality, Plaintiff was subjected to disciplinary action as a result of them, and they were found to be false at the post–deprivation arbitration (*see* Arbitration Award, Ex. 3 to Pl.'s 56(a)1 Stmt. at 64–69), they were unquestionably stigmatizing. Thus, the question that remains is whether Plaintiff received all of the process that he was due as a result of this deprivation of liberty.

Generally, as discussed above, due process requires that a state afford persons "some kind of hearing" *prior* to depriving them of a liberty or property interest. *See DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003) (internal citations omitted). Defendants argue that Plaintiff received all the process to which he was due in the "post–deprivation name–name clearing hearing" that he received in the form of his Arbitration Award. (Def.'s Mem. Supp. at 17–19.) However, in the Second Circuit, post–deprivation hearings are sufficient *only* "[w]here a deprivation at the hands of a government actor is 'random and unauthorized,' hence rendering it impossible for the government to provide a pre–deprivation hearing." *DiBlasio*, 344 F.3d at 302. This "random and unauthorized" exception does not apply where "the government actor in question is a high–ranking official with final authority over significant matters." *Id.* (citing *Burtnieks v. City of New York*, 716 F.2d 982, 988 (2d Cir.1983)) ("In our view, however,

---

[7] In *Strasburger*, the Seventh Circuit found that while the defendant school board "ha[d] not treated Strasburger well, the record does not reflect a constitutional violation," because the plaintiff could not provide evidence of false statements made by public officials. *Id.* at 357. There, several deponents had testified that they heard "rumors" to the effect that plaintiff was a rapist, though no one was able to testify that they heard the rumors from a public official. *Id.* Thus, the Seventh Circuit affirmed the district court's grant of summary judgment on plaintiff's stigma–plus claim.

decisions made by officials with final authority over significant matters, which contravene the requirements of a written municipal code, can constitute established state procedure."); *see also Dwyer v. Regan*, 777 F.2d 825, 832 (2d Cir. 1985) ("In contrast, where the depriving actions were taken by a high-ranking official having final authority over the decision-making process, this Court has found that they were not random or unauthorized.").

Defendant Formica is a "high–ranking official," and accordingly, the "random and unauthorized" exception to pre–deprivation process does not apply here. As the First Selectmen, he serves as the Chief of Police for the Town of East Lyme, and the Board of Selectmen are charged with the appointment of constables and special constables (*see* Ex. 37 to Pl.'s 56(a)1 Stmt. at 4.6.1), as well as with dismissing employees of the town (*see id.* at 3.2.3). Thus, Mr. Holmes was entitled to "some kind of hearing" prior to being terminated, and he received only inadequate notice of the charges against him and a post–deprivation hearing. Accordingly, the Court denies Defendants motion for summary judgment on this count, and grants Plaintiff's motion for summary judgment.

### 3. Qualified Immunity as to Counts Three and Four

Defendants maintain that Defendant Formica is entitled to qualified immunity in his individual capacity on each of the due process claims. In *Saucier v. Katz*, 533 U.S. 194, the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims:

> First, a court must decide whether the facts that a plaintiff has alleged (see, Fed. R. Civ. P. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct.

24

> Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.

*Pearson v. Callahan*, 555 U.S. 223, 128 S. Ct. 808, 815–16 (2009). In *Pearson*, the Court held that the *Saucier* protocol should not be regarded as "mandatory, but that the two–step process is often beneficial." 128 S. Ct. at 818. Here, because summary judgment is being entered for Plaintiff on both due process claims, the Court must consider whether Plaintiff's rights were "clearly established" at the time Defendant Formica acted.

A defendant will be entitled to summary judgment on qualified immunity grounds when "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999). Defendants rely on the fact that Formica was acting on the advice of counsel when he acted, however the Second Circuit has held that "reliance on the advice of counsel . . . cannot be used to support the defense of qualified immunity." *In re County of Erie*, 546 F. 3d 222, 229 (2d Cir. 2008).

"The question of whether a right is 'clearly established' is determined by reference to the case law extant at the time of the violation." *In re County of Erie*, 546 F.3d 222, 229 (2d Cir. 2008). The case law describing the constitutional protections where liberty or property interests are at stake is longstanding and well established. "Where a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). In *Roth*, the Supreme Court held that the dismissal of a

government employee accompanied by a "charge against him that might seriously damage his standing and associations in his community" would qualify as something "the government is doing to him," so as to trigger the due process right to a hearing. *Board of Regents v. Roth*, 408 U.S. 564, 573. Thus, the Court concludes that at the time of Plaintiff's dismissal, his rights were clearly established.

Viewed in the light most favorable to Plaintiff, a reasonable jury could find that it was objectively unreasonable that Plaintiff was not presented with notice of the full set of charges against him, that Plaintiff was prevented from presenting his side of the events in question, and that Mr. Formica should have known that Plaintiff, as a union employee, was entitled to dismissal only for "just cause." Further, the digital recording of the Board of Selectmen meeting reveals that Mr. Formica was focusing intently on the "interpretation of the contract" when he asked the member of the Board to vote on Mr. Holmes's non–reappointment and noted that Plaintiff, if he chose to, could always bring a grievance through his union. (*See* DVD, Ex. 34 to Pl.'s 56(a)1 Stmt, at 1:36:00.) Factual issues remain for jury determination, such as how to interpret the language of the Collective Bargaining Agreement, or how a reasonable First Selectman would have addressed the lack of clarity between the Collective Bargaining Agreement and the language in the Town Charter. Thus, this inquiry into reasonableness is not appropriately decided on summary judgment, and accordingly, Defendants' motion for summary judgment on qualified immunity grounds will be denied.

B.     Counts One, Two, Five, and Six: Connecticut State Law Claims Against

the Town and Formica

1.     *Count Two: Protected Speech under Conn. Gen. Stat. § 31-51q*

Defendants move for summary judgment as to Count Two, Connecticut's Whistle

blower statute, asserting that (1) Plaintiff's alleged speech did not address a matter of

public concern, and (2) Plaintiff failed to plead that the exercise of his rights substantially

or materially interfered with his working relationship with the Town. (Town's Mem. at

27.)

Conn. Gen. Stat. § 31-51q states:

Any employer, including the state and any instrumentality or political
subdivision thereof, who subjects any employee to discipline or discharge
on account of the exercise by such employee of rights guaranteed by the
first amendment to the United States Constitution or section 3, 4 or 14
of article first of the Constitution of the state, provided such activity does
not substantially or materially interfere with the employee's bona fide job
performance or the working relationship between the employee and the
employer, shall be liable to such employee for damages caused by such
discipline or discharge, including punitive damages, and for reasonable
attorney's fees as part of the costs of any such action for damages. If the
court determines that such action for damages was brought without
substantial justification, the court may award costs and reasonable
attorney's fees to the employer.

Defendants argue that summary judgment is proper on this count because the speech

protected by the statute can only be speech regarding issue of public concern, and

Plaintiff's speech only concerned his own private interests.

"Whether the subject matter addressed by a particular statement is of public

concern involves a question of law for the court." *Daley v. Aetna Life & Casualty Co.*, 249

Conn. 766 (1999). "Whether a particular statement addresses such a matter depends on

27

its content, its form, and the context in which it is made. This latter inquiry necessarily involves a question of fact." *Id.* "The court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it has a broader public purpose." *Lewis v. Cowen*, 165 F3d 154, 163–64 (2d Cir. 1999).

The protected speech in question must touch on a matter of public concern, and if it does, then the plaintiff's motivation for the speech becomes a question for the jury. For example, in *Campbell v. Windham Community Memorial Hospital, Inc.*, 389 F. Supp. 2d 370 (D. Conn. 2005), Judge Hall found that "it could not be said that [the plaintiff's] speech concerned only the scope of the terms and conditions of [plaintiff's] employment, and concluded that speech that addressed plaintiff's "employer's potentially illegal practices with respect to private third parties" was a matter of public concern, and denied the employer's motion for summary judgment. 389 F. Supp. 2d at 381. However, *Campell* is distinguishable from the speech at issue here: there, the plaintiff's speech "did not relate to the terms of her employment or her own pay and salary. Instead it addressed in part her employer's potentially illegal practices." 389 F. Supp. 2d at 381. Here, the record shows that in his November 29, 2007 Memorandum to First Selectman Hogan, Plaintiff listed some of the issues he had broached with Hogan, including, "pay issues, part time hours and how time was being incorrectly charged to this account causing the 'over the budget condition,'" and "the continued harassment both verbal, written and the hostile work environment that has been created by Sergeant Saffioti." (November 29, 2007 Memorandum, Ex. 5 to Pl.'s 56(a)1 Stmt.)

While it is the case that speech that concerns the management of government funds constitutes protected speech, *see Vasbinder v. Scott*, 976 F.2d 118, 119-20 (2d Cir.1992), speech that relates to a public employee's personal "pay issues" does not automatically render it an issue of public concern. Viewing the record in the light most favorable to Plaintiff, the court concludes that no reasonable juror could find that Plaintiff was motivated by matters of public concern when he submitted his memo to First Selectwoman Hogan. The substance of the memorandum addressed the tense relationship between him and Sergeants Crooks and Saffioti, and case law does not support a finding that this could be a matter of public concern. *See, e.g.*, *Gorman–Bakos v. Cornell Co–op Extension of Schenectady County*, 252 F.3d 545, 553 n.4 (2d Cir. 2001) ("Plaintiffs' claims related to the administration of the Cooperative and the allocation of funds were based on alleged mismanagement of government funds and violations of its by–laws, which are clearly matters of public concern. . . . Plaintiffs' other speech focused on the safety of young children at horse shows involving 4–H, a matter of public concern."); *Johnson v. Multnomah County, Oregon*, 48 F.3d 420, 425 (9th Cir.), *cert. denied*, 515 U.S. 1161 (1995) ("[W]e have stated that misuse of public funds, wastefulness, and inefficiency in managing and operating government entities are matters of inherent public concern."). Thus, summary judgment will be granted for Defendants Town of East Lyme and Paul Formica on Count Two.

### 2.    *Count Five: Defamation as to Defendant Formica*

Defendant Formica has also moved for summary judgment as to Count Five, and Plaintiff has moved for summary judgment under Rule 56(f) (summary judgment "independent of the motion"). Defamation, the tort that encompasses libel and slander,

is established by demonstrating that (1) the defendant published a defamatory statement; (2) the defamatory statement identified plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement. *Cweklinsky v. Mobil Chemical Co.,* 267 Conn. 210, 217 (2004). In *Lizotte v. Welker,* 45 Conn. Sup. 217, 709 A.2d 50 (1996), the court defined defamation as "that which tends to injure reputation in the popular sense, to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him." 45 Conn. Sup. at 220.

Plaintiff, as a police officer, concedes that he is a public figure for defamation purposes. Therefore, he must show that Formica acted with actual malice in defaming him. *Miles v. Perry,* 11 Conn. App. 584, 588–89. Actual malice can be demonstrated by showing the defendant made the statement with knowledge the statement was false or with reckless disregard for whether it was false or not. *Holbrook v. Casazza,* 204 Conn. 336, 342 (1987). Whether a defendant had knowledge of the falsity of a defamatory statement is a question for a trier of fact. *Bleich v. Ortiz,* 196 Conn. 498, 501 (1985).

Defendants argues that Formica's statements are either true, or statements of opinion, and thus cannot form the basis of a claim of defamation. *See Johnson v. Chesebrough–Pond's USA Co.,* 918 F. Supp. 543, 551–52 (D. Conn. 1996), *aff'd,* 104 F.3d 355 (2d Cir. 1996) (statements about job performance, such as plaintiff "didn't fit in" and "could not be recommended" were opinions, and therefore not defamatory). Plaintiff counters that Formica's statements were made with reckless disregard as to their truth or falsity, as Formica failed to conduct an adequate investigation into the charges against Plaintiff. At the Board meeting, both Attorney Satti and Selectmen Wilson noted that the

four hour time card issue "came up a lot" with other officers, but Formica focused only on the Plaintiff as someone with a problematic "pattern of behavior over a period of time." (DVD.) Reckless disregard for the truth of a statement may be found when an individual publishes defamatory statements with a "high degree of awareness of . . . probable falsity . . . or entertained serious doubts as to the truth of [the] publication." *Woodcock v. Journal Publishing Co.*, 230 Conn. 525 (1994) (citing *St. Amant v. Thompson*, 390 U.S. 727, 730 (1968)). The "publication" element is also satisfied here, as all that is required is the communication of statements to a third party, and not, as Defendant argues, the publication of the statement to the public. *See Miles v. Perry*, 11 Conn. App. 584 (1987).

There are sufficient facts in the record that, viewed in the light most favorable to Plaintiff, would allow a reasonable juror to find that Defendant Formica acted with actual malice when he made the statements in question at the Board meeting. The record shows that Formica consciously disregarded evidence that the four–hour minimum overtime issue was not unique to Plaintiff, and that in spite of evidence showing that this appeared to be a practice in the department, Formica made his statements about "violating the trust," and about the Board "doing an injustice" if they let the issue of Mr. Holmes's appointment sit another day." (DVD at 1:33:35–1:45:33.)[8] The Court concludes that both parties' motions must be denied, and the question of actual malice must be submitted to a jury.

---

[8] Though Defendants assert that Formica is entitled to a qualified privilege defense, a qualified privilege can be overcome by a showing of actual malice, *Mara v. Otto*, 127 Conn. App. 404, 406 (2011), and thus, this issue must be left for jury determination.

3.      *Count Six: False Light Invasion of Privacy as to Defendant Formica*

Defendant Formica moves for summary judgment as to Count Six, false light invasion of privacy. "In order to establish invasion of privacy by false light, the plaintiff must show "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Jonap v. Silver*, 1 Conn. App. 550, 557–558 (1984) (quoting 3 Restatement (Second), Torts § 652E; *Honan v. Dimyan*, 52 Conn. App. 132-133 (1999)). The 'publicity' associated with invasion of privacy "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Orsini v. Zimmer*, No. CV075013711S, 2009 WL 5698148, at *7 (Conn. Super. 2009) (quoting 3 Restatement (Second), Torts § 652D, cmt.a).

In the employment context, when information is conveyed only to employees with a duty, responsibility, and need for such information, there is not sufficient publicity to support an action for invasion of privacy. *See, e.g.*, *Grossman v. Computer Curriculum Corp.*, 131 F. Supp. 2d 299, 311–12 (D. Conn. 2000) (citing *Pace v. Bristol Hosp.*, 964 F.Supp. 628, 631–32 (D. Conn. 1997)) (concluding that former employer's dissemination of information regarding circumstances of former employee's discharge to management personnel, interested co-workers and independent contractor with whom plaintiff worked did not constitute "publicity" necessary to state a false light claim). If an employer communicates false information concerning a former employee to so many persons that

the matter must be regarded as substantially certain to become one of public knowledge, a false light claim may lie. *See Grossman*, 131 F. Supp. 2d at 312.

Here, Defendants' main contention is that Plaintiff chose to have the meeting held in open session. (Town's Mem. at 40.)[9] "In the context of a cause of action for invasion of privacy, the term publicity means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Sidiropoulos v. Bridgeport Hosp.*, No. CV030401830S, 2004 WL 202256, at *2 (Conn. Super. Jan. 9, 2004) (internal quotations omitted). "[I]t is not an invasion of privacy to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. Publicity is a communication that reaches, or is sure to reach, the public at large." *Id.* (citing *Cyr v. Mountain Grove Cemetery Assoc.*, No. CV030401575, 2003 WL 21805496 (Conn. Super. July 18, 2003)). Here, the Board of Selectmen meeting at which Formica's statements were made was aired multiple times on public access television (*see* Pl.'s Aff. ¶ 13; Morris Dep., Ex. 39 to Pl.'s 56(a)1 Stmt at 9–10), and thus, the matter "must be regarded as substantially certain to become one of public knowledge." *Grossman*, 131 F. Supp. 2d at 312.

The record here supports Plaintiff's contention that Formica's communication reached the public at large, and what Formica said about Plaintiff could be found highly

---

[9] In support, Defendants cite one 1976 case, *LaFontaine v. Family Drug Stores*, 33 Conn. Supp. 66, 72 (1976), which held that the plaintiff could not recover on her invasion of privacy claim where she did not show that the defendant caused the publication about her, as there was no evidence that defendant notified the media. However, the issue in *LaFontaine* concerned whether a person charged with a criminal offense loses the right of privacy regarding that matter. Neither the facts nor the law in *LaFontaine* are applicable to this case.

offensive by a reasonable juror. Accordingly, Defendant's motion for summary judgment is denied as to Count Six.

### 4. Governmental Immunity

Defendants argue that regardless of the merits of Counts Five and Six, Mr. Formica is entitled to summary judgment on Plaintiff's defamation and false light invasion of privacy claims, because governmental immunity bars both claims. (Town's Mem. at 37.) Under Conn. Gen. Stat. § 52-557n, the state legislature imposed liability on a municipality for the "negligent acts or omissions of . . .  any employees" but it has not waived the municipality's immunity from liability for the intentional torts of its employees and officials.

The Connecticut Supreme Court has also held that, while municipal employees are immune from liability for their negligent acts, they are not immune from liability for acts that "involve malice, wantonness or intent to injure, rather than negligence." *Evon v. Andrews*, 211 Conn. 501, 505 (1989). Plaintiff argues that the special defense of governmental immunity has been found not to apply to the claim of willful and intentional wrongdoing, including defamation, alleged by a plaintiff against a municipal employee. *Hamden Salvage Inc. v. Kops*, 1999 WL 1241904 (Conn. Super. 1999).

In *Sammartino v. Turn,* No. CV99070151, 2003 Conn. Super. LEXIS 564, at *3–5 (Feb. 28, 2003), relied on by Defendant, the court found that governmental immunity was a complete defense to an intentional tort claim against the "First Selectman of the Town of Andover," sued only in his official capacity. However, Plaintiff has sued Formica in his individual capacity (*see* Compl. Counts Three, Four, Five, Six, all against Formica in his

official and individual capacities), therefore Mr. Formica's defense of governmental immunity will not apply here.

### 5. Count One: Retaliation under Conn. Gen. Stat. § 31-51m

Defendants argue that Plaintiff has "failed to state a claim" under Conn. Gen. Stat. § 31-51m, which states, in relevant part:

> No municipal employer shall discharge, discipline or otherwise penalize any employee because the employee, or a person acting on behalf of the employee, reports, verbally or in writing, to a public body concerning the unethical practices, mismanagement or abuse of authority by such employer.

Conn. Gen. Stat. § 31-51m(b). "Public Body" is defined as "(A) any public agency, . . . or any employee, member or officer thereof, or (B) any federal agency or any employee, member or officer thereof." *Id.*

In an action under the state whistleblower statute, the plaintiff has the initial burden to prove by a preponderance of the evidence a *prima facie* case of retaliatory discharge: (1) that the plaintiff engaged in a protected activity as defined by § 31-51m(b); (2) that the plaintiff was subsequently discharged from his employment; and (3) that there was a causal connection between his participation in the protected activity and his discharge. *See Arnone v. Town of Enfield*, 79 Conn. App. 501, 507, 831 A.2d 260, 266 (2003). A plaintiff's burden of establishing a *prima facie* case by presenting evidence which allows a rational trier of fact to raise an inference of retaliatory discharge is *de minimis*. *LaFond v. General Physics Services Corp.*, 50 F.3d 165, 173 (2d Cir. 1995).

Defendants have not provided any legal arguments or citations to the record in support of their motion on this count, and a reasonable jury could find that Plaintiff has met his *de minimus* burden of establishing a *prima facie* case of retaliatory discharge: Mr.

Holmes's memorandum was a written report to the First Selectwoman, the Chief of Police, concerning "unethical practices, mismanagement or abuse of authority by such employer" as contemplated under the statute (Ex. 5 to Pl.'s 56(a)1 Stmt), and upon complaining to First Selectwoman Hogan about how Sgts. Crooks and Saffioti treated him, Sergeant Crooks and Defendant Formica launched an investigation into his timecard submissions, culminating in the decision to not reappoint Mr. Holmes to his 23–year position as a special constable. Drawing all inferences in Mr. Holmes's favor,  summary judgment is denied as to Plaintiff's § 31-51m claim.

C.      Counts: Fix, Six, and Seven: Claims Against Defendant Richard Crooks

Plaintiff moves for summary judgment against Defendant Sergeant Crooks on Counts  Five and Six of the Amended Complaint. Sergeant Crooks cross–moves for summary judgment on those counts as well as on Count Seven (Intentional Infliction of Emotional Distress).

1.      *Count Five: Defamation*

Sergeant Crooks argues that summary judgment should enter in his favor as to Count Five because he was only expressing statements of opinion, which are not actionable, he made no false statements of fact, and the truth is a complete defense to a claim of defamation. *See Holbrook v. Casazza*, 204 Conn. 336, 361 (1987).

As evidence of his defamation claim, Plaintiff points specifically to Sergeant Crooks' retelling of the "McCook Park incident" at the Board meeting. Sergeant Crooks spoke of this incident without revealing the full back story; as discussed *supra*, Plaintiff was in fact called into work at the last moment to replace an injured officer. Sergeant Crooks also likened Plaintiff's over–billing in that particular instance to Plaintiff's billing practices

36

in other instances, stating: "One or two mistakes you can explain but there's a certain pattern of behavior over a period of time." (DVD.)

Here, the record shows that Crooks discussed the allegations constituting the McCook Park incident with the Board, but had never spoken with Plaintiff or with Sergeant Renshaw about the allegations, which ultimately were found to be false. The record also shows that Sergeant Crooks made these statements as part of the Board's investigation into Plaintiff's reappointment. While Sergeant Crooks may not have knowingly made any false statements of fact, the record is sufficient to convince a reasonable juror that Crooks acted in reckless disregard of the truth when he made these statements. For that reason, Sergeant Crooks' motion for summary judgment is denied. As for plaintiff's motion, a reasonable juror could similarly find that Sergeant Crooks did not act with actual malice when he made these statements—he interviewed other officers about the McCook Park incident as part of his investigation into Plaintiff's time card issue, and he recounted what they had told him at the Board meeting. Accordingly, summary judgment is also denied as to Plaintiff's motion on Count Five.

### 2.      Count Six: False Light Invasion of Privacy

As discussed above, the type of false light claim alleged by Plaintiff protects a person's interest in not being placed before the public in an objectionable position that is false and is "a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable person in his position." *Jonap v. Silver*, 1 Conn. App. 550, 558 (1984). Not every unwelcome public comment satisfies the legal necessity that the statement be "highly offensive." Isolated negative statements, even if false, do not meet the requirement for highly offensive

behavior. *Cavallero v. Rosado*, No. CV 05–4009939, 2006 Conn. Super. LEXIS 2919, at *17 (Conn. Super. Oct. 5, 2006).

Sergeant Crooks argues that his statements were neither knowingly false nor highly offensive. (Crooks' Mem. Supp. at 11.) However, as discussed above with respect to the claim against Defendant Formica, mere reckless disregard for the truth is all that is required for actual malice. Viewed in the light most favorable to Plaintiff, Crooks' statements speak directly to the Plaintiff's character for honesty and suggest that the Plaintiff was cheating. A reasonable juror could conclude that such statements were "highly offensive." On the other hand, and viewing the record most favorably to Sergeant Crooks, a reasonable juror could also find that Sergeant Crooks' statements did not rise to that level of offensiveness, nor that they were made with actual malice. Accordingly, summary judgment is denied as to all motions on Count Five against Sergeant Crooks.

### 3.    *Count Seven: Intentional Infliction of Emotional Distress*

Sergeant Crooks also moves for summary judgment on Plaintiff's claim of intentional infliction of emotional distress (Count Seven). In order to prevail on a claim for the intentional infliction of emotional distress in Connecticut, a plaintiff has the burden of establishing four elements:

> It must be shown: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe.

*Petyan v. Ellis*, 200 Conn. 243, 253 (2006). "Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very

serious kind." *Ancona v. Manafort Bros., Inc.*, 56 Conn. App. 701, 712 (2000). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Carrol v, Allstate Insurance Co.*, 262 Conn. 433, 443 (2003).

Under Connecticut law, conduct rises to the level of "extreme and outrageous" when a "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Appleton v. Board of Educ. of Town of Stonington*, 254 Conn. 205, 211(2000). Defendant Crooks argues that Plaintiff's allegations, and the record, do not support the argument that his behavior rose to the level of "extreme and outrageous conduct."

Indeed, the bar for conduct that is found to be "extreme and outrageous" is set very high. For instance, in *DeLeon v. Little*, a district court considered a situation where the defendant's alleged conduct towards the plaintiff included:

> orders to purchase illegal drugs, orders to stand guard while [d]efendant ingested illegal drugs, orders to perform personal errands, orders to perform tasks for a private employer, repeated telephone calls to plaintiff at her home, threats to terminate plaintiff's employment and replace her with an individual of another race, implementation of discriminatory sick time policies, monitoring of attendance at work, and repeated degrading and humiliating criticism of Plaintiff in the presence of others.

981 F. Supp. 728, 738 n.8 (D. Conn. 1997). The court held that the defendant's action did "not rise to the level of extreme and outrageous behavior. There is no evidence that Defendant's requests were accompanied by any threat of force or physical violence." *Id.* at 738-39. In *Bombalicki v. Pastore*, 71 Conn. App. 835, 841 (2002), when the evidence showed that the defendant's actions "with respect to the plaintiff included expressing his

dislike of the plaintiff, talking about the plaintiff unfavorably to other [employees], opposition to the plaintiff's promotion and an ultimate decision not to recommend the plaintiff for promotion," the court held that was insufficient evidence of extreme or outrageous behavior to support a claim for intentional infliction of emotional distress. 71 Conn. App. at 841.

Plaintiff contends that there is no bright line rule for determining whether conduct was extreme and outrageous, and that the facts and circumstances of each specific case should be considered. *See Crocco v. Advance Stores Co. Inc.,* 421 F. Supp. 2d 485 (D. Conn. 2006) (denying summary judgment on the IIED claim and finding that "reasonable minds could differ" on whether plaintiff's former supervisor and co-worker reporting false information to a police officer in order to give the impression that the plaintiff was stalking them could constitute extreme and outrageous conduct). In considering the threshold question for IIED claims, Connecticut courts have also considered whether an alleged harasser was in a position of authority; *Cox v. Brennan*, No. TTDCV0960000758S, 2010 WL 1665316, at *2 (Conn. Super. Mar. 31, 2010) (finding that "[r]epeatedly submitting false accusations, knowing them to be false, to a rival's employer or supervisor in order to tarnish the other person's workplace reputation to enhance one's own career would appear, if true, to satisfy the high level of reprehensible conduct demanded by this tort," and denying the defendant's motion to strike); *see also Musacchio v. Cooperative Educations Svcs.*, No. CV 94 0137050 S, 1995 WL 681664 (Conn. Super. Nov. 8, 1995) (finding that there was a jury question as to whether a supervisor's false accusation of lying amounted to extreme and outrageous conduct).

Considering the facts and circumstances of the instant case, the Court concludes that the record does not support a cause of action for the intentional infliction of emotional distress. Defendant Crooks was Plaintiff's supervisor, and it may be the case that the manner in which Sergeant Crooks conducted his investigation into Plaintiff's time cards was not commendable. Sergeant Crooks reported that Plaintiffs showed up for the McCook Park assignment "two hours late. Other officers told me that he didn't report until two hours late and still billed the Town for four hours." (DVD at 1:27:12–1:27:29.) This testimony was found to be untrue (*see* Renshaw Test. at 41:17–46:16), but nothing in the record supports Plaintiff's contention that Sergeant Crooks intentionally reported false information to the Board of Selectmen (*see* Pl.'s Dep. at 80:23–81:2 (Plaintiff testified that "I don't know why [Sergeant Crooks] he [told them about the McCook Park incident]," and that he didn't know what the basis of Sergeant Crooks's statement was)). The record shows that Crooks, in uniform, went to Plaintiff's full–time employer in order to check on his whereabouts on the dates at issue (*see* Crooks Aff. ¶ 26), however, the record does not support Plaintiff's claim that Crooks accused Plaintiff of lying or being dishonest in front of his employer, or that he "conducted a hostile and unwarranted investigation at the DOT" (Pl.'s Mem. Opp'n at 16). In sum, no reasonable juror could find that Sergeant Crooks' behavior rose to the level of "extreme and outrageous" conduct under Connecticut law. Accordingly, summary judgment will enter in Crooks' favor on Count Seven.

III.     Conclusion

For the reasons discussed above, Plaintiff's Motion for summary judgment [Doc. # 60] against the Town and Defendant Formica is GRANTED in part, as to Counts Three and Four, and DENIED in part, as to Counts Five and Six. Plaintiff's Motion for summary judgment against Defendant Crooks [Doc. # 64] is DENIED in its entirety. Defendants Town of East Lyme and Paul Formica's Motion [Doc. # 66] is GRANTED as to Count Two, and DENIED as to the remaining counts. Defendant Crooks's motion [Doc. # 63] is GRANTED as to Count Seven and DENIED as to Counts Four and Five.


IT IS SO ORDERED.



_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of March, 2012.